# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MAURICE MARIE DIDON,** | : | **CIVIL ACTION NO. 1:15-CV-1586** |
| | : | |
| **Petitioner** | : | **(Chief Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **ALICIA DOMINGUEZ CASTILLO,** | : | |
| | : | |
| **Respondent** | : | |

## MEMORANDUM

Presently before the court is a verified complaint (Doc. 1) filed by petitioner Maurice Marie Didon ("Didon") under the Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention"),[1] implemented into United States law by the International Child Abduction Remedies Act, 22 U.S.C. §§ 9001 *et seq.*, requesting the return of minor children J.D. and A.D. to Saint Martin/French

---

[1] The Hague Convention is a multilateral treaty that provides for the expeditious return of a minor child wrongfully removed or retained from his or her habitual residence. The Convention "provides a legal process 'to restore the status quo prior to any wrongful removal or retention, and to deter parents from engaging in international forum shopping in custody cases.'" <u>Karpenko v. Leendertz</u>, 619 F.3d 259, 263 (3d Cir. 2010) (quoting <u>Tsai-Yi Yang v. Fu-Chiang Tsui</u>, 499 F.3d 259, 270 (3d Cir. 2007)). Petitions made pursuant to the Convention are to be filed in the jurisdiction where the child is located at the time of the filing. 22 U.S.C. § 9003(b). Importantly, Hague Convention cases are *not* child custody cases and do not substantively resolve child custody disputes. <u>See</u> Hague Convention, art. 19 ("A decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue."). In other words, the end result is simply a provisional remedy, to wit: a return of the child to his or her place of habitual residence. In effect, the court's decision dictates where the custody dispute will be resolved.

West Indies.[2]  Didon claims that respondent Alicia Dominguez Castillo ("Castillo") wrongfully retained J.D. and A.D. in the United States, away from J.D. and A.D.'s habitual residence, in violation of Didon's custody rights.  Didon offered evidence and argument at an initial hearing on September 2, 2015,[3] and the court adjourned to permit Dominguez an opportunity to secure counsel.  Dominguez did secure counsel, and the hearing continued on September 22, 2015.[4]  For the reasons that follow, the court will grant in part and deny in part Didon's petition.

I.    **Findings of Fact**

The court finds the following facts on the basis of the record in the above-captioned case, including the verified complaint, the exhibits attached thereto, and the testimony and other evidence presented at the September 2 and September 22

---

[2] Saint Martin/French West Indies ("Saint Martin"), a collectivity under French sovereignty; Sint Maarten, a territory under Netherlands sovereignty, which shares a border with Saint Martin; and the United States are all Contracting States to the Hague Convention.

[3] Citations to the September 2 hearing transcript (Doc. 13) are abbreviated throughout as "9/2/15 Hr'g Tr."

[4] The Hague Convention requires the court to act "expeditiously" in resolving petitions brought pursuant to its authority and specifically provides that the Central Authorities will make inquiry into any matter that has been pending for more than six weeks.  See Hague Convention, art. 11.  Didon commenced this action on August 13, 2015, and the Convention's six-week resolution guideline expires at the end of this week.  As of the date of this opinion, an official transcript of the September 22 hearing is not yet available.  The court reporter has provided the court with a rough draft of the transcript of that hearing, and citations thereto are abbreviated throughout as "9/22/15 Hr'g Tr."  The parties should note, however, that pagination of the rough draft may vary from pagination of the official transcript of proceedings, when available.  Hearing exhibits from both proceedings will be cited as "Didon Ex. __" and "Dominguez Ex. __" herein.

2

hearings. These findings reflect the court's determination of witness credibility and specifically resolve conflicts created by the parties' testimony.

Dominguez moved to Sint Maarten[5] in 2007, and met Didon in 2008. When Dominguez moved to Sint Maarten, her two daughters, minor children J.D.[6] and A.A.,[7] remained in Santo Domingo with their grandmother. In 2009, Dominguez and Didon moved in together in Didon's apartment, located on the Dutch side of the island, and A.A. came to live with them. On November 3, 2010, the couple's first and only biological child, son A.D., was born. Sometime in 2011, Dominguez's other daughter, minor child J.D., joined the family in Sint Maarten. The family resided together from 2009 until August 27, 2014. It is undisputed that Dominguez and Didon never married. The family resided on the Dutch side of the island, but was primarily oriented to the French side, where Didon worked, and where the children attended school, went to doctor's appointments, etc.

---

[5] The island known as "Saint Martin" actually comprises two separate countries, with Sint Maarten, the "Dutch side," to the south, and Saint Martin, the "French side," to the north. The island is divided approximately midway by a shared international border. See *Sint Maarten*, U.S. DEP'T OF STATE, BUREAU OF CONSULAR AFFAIRS, http://travel.state.gov/content/passports/en/country/sint-maarten.html (last visited Sept. 24, 2015) ("Sint Maarten is the Dutch side of the island shared with St. Martin, which is administered by the French government."); *French West Indies*, U.S. DEP'T OF STATE, BUREAU OF CONSULAR AFFAIRS, http://travel.state.gov/content/passports/en/country/FrenchWestIndies.html (last visited Sept. 24, 2015) ("The French West Indies consists of the islands of Martinique, Guadeloupe, St. Martin (the French side) and St. Barthélemy.").

[6] Minor child J.D. is the biological daughter of Dominguez and Manuel de Jesus Tavares.

[7] Minor child A.A. is the biological daughter of Dominguez; her biological father was not identified to the court. A.A. is sixteen (16) years old, and not a subject of the instant petition. (See Doc. 1 ¶ 10).

Dominguez and Didon both report a discordant family life. Dominguez contends that Didon imposed strict rules on the entire family, and Didon asserts that Dominguez did not devote requisite time and energy to family commitments, such as nightly dinners together. Dominguez, A.A., and Didon all testified that, per Didon's request, the door to the sole bathroom in the apartment was to remain open at all times, so that more than one person could use the bathroom at a time. Didon disputes the characterization of his "suggestion" as a "rule," but concedes that due to the apartment's size, and the presence of curtains separating the various sections of the bathroom, he suggested that the bathroom door remain open. Dominguez alleges that Didon physically abused her, J.D., and A.A., but denies any instances of abuse of A.D. With the exception of a verbal altercation between A.A. and Didon, Dominguez did not report any of these alleged incidents of abuse to authorities. Didon denies Dominguez's allegations.

In 2011, after J.D. joined her mother in Sint Maarten, Didon and Dominguez petitioned the French consulate to change J.D.'s birth certificate to identify Didon as her father. Didon and Dominguez were issued a new birth certificate including both of their names as father and mother, respectively, of J.D. Didon asserts that this modification of the birth certificate, which he refers to as "acknowledging" or "recognizing" J.D., constitutes a formal adoption for purposes of the Convention. Didon testified that the parties never appeared before a court or otherwise formally engaged in the adoption process.

In July of 2014, Didon commenced a custody action in French civil court, seeking full custody of both J.D. and A.D. Dominguez was never served with any

papers or otherwise advised of the custody proceeding. From July 13, 2014 until August 13, 2014, the entire family, including Dominguez, Didon, J.D., A.D., and A.A., vacationed in Paris. When the family returned to Sint Maarten, Dominguez advised Didon that she and the children—specifically J.D. and A.D.—were traveling to New York City to attend the wedding of Dominguez's sister.[8] Dominguez told Didon that she would depart with the children from Sint Maarten on August 27, 2014, and return on September 7, 2014. The record reveals that Dominguez purchased, and showed to Didon, three round-trip tickets from Sint Maarten to New York City, confirming her intent to return to him.

Dominguez and the children did not return as planned on September 7, 2014. Didon began to suspect that Dominguez did not intend to return when he contacted the children's school on September 6, 2014, to inform the school that J.D. would be absent for a brief period of time due to a vacation to the United States; according to Didon, the school's administrators responded that they were not expecting J.D. to return because Dominguez had disenrolled the children. Didon filed a police report that same day. The parties agree that the police were able to contact Dominguez on September 6, 2014, but dispute whether Dominguez promised to return the

---

[8] The record is less than pellucid with respect to A.A.'s move to the United States, and whether she accompanied Dominguez, J.D., and A.D. on the trip; in any event, the instant petition does not concern A.A., and the court need not resolve any factual disputes on this matter.

following day during the call.  In any event, the most significant point is not disputed: Dominguez did *not* return with the children on September 7, 2014.[9]

In the following months, Didon received only one text message and one phone call from the children.  Didon continued to pursue his custody action in French civil court, and in Dominguez's absence, on March 23, 2015, that court entered a custody judgment in favor of Didon and against Dominguez, purporting to grant full custody of J.D. and A.D. to Didon.  During this time, Didon also retained the services of a private investigator to search for the children.  The investigator's efforts were ultimately successful in the summer of this year, when Internet searches revealed J.D.'s name on a published honor roll list in Hazleton, Pennsylvania.

Didon commenced this action with the filing of a verified complaint (Doc. 1) pursuant to Article 3 of the Hague Convention on August 13, 2015.[10]  Simultaneously with the complaint, Didon filed an *ex parte* motion (Doc. 5) seeking emergency provisional remedies in the form of a temporary restraining order and an expedited hearing on the merits of his request for immediate return of J.D. and A.D. to Saint

---

[9] The Convention only applies to minor children under sixteen (16) years of age.  Because both J.D. and A.D. were under the age of sixteen when Dominguez retained them in the United States, both children are within the Convention's scope.  See Hague Convention, art. 4 ("The Convention shall cease to apply when the child attains the age of 16 years.").

[10] In accordance with the Convention, Didon properly filed the petition in this court as the jurisdiction in which J.D. and A.D. are presently residing.  See 22 U.S.C. § 9003(a)-(b) (providing that the United States district courts and the courts of the states shall have concurrent jurisdiction of Hague Convention matters, and that a petition shall be filed in a court "authorized to exercise its jurisdiction in the place where the child is located at the time the petition is filed")

Martin.  The court convened an *ex parte* telephonic hearing on August 14, 2015, and upon consideration of the arguments of Didon's counsel, entered an order (Doc. 7) granting the requested relief, directing the United States Marshals Service for the Middle District to serve a copy of the order and Didon's complaint on Dominguez, and to confiscate the passports and any other travel documents of Dominguez, J.D., and A.D.  The court further granted Didon's request for a temporary restraining order and enjoined Dominguez from removing the children from the court's jurisdiction pending a hearing on the merits of Didon's complaint.

The court convened a preliminary hearing on September 2, 2015, during which Didon appeared with counsel and Dominguez appeared *pro se*.  Didon offered both evidence and argument in support of his complaint, and the court adjourned to allow Dominguez an opportunity to secure counsel.  Counsel entered appearances on behalf of Dominguez on September 11, 2015, and September 21, 2015, respectively, and the court convened a final hearing on September 22, 2015.  During the hearing, Dominguez presented evidence in defense of the petition, and Didon presented rebuttal testimony.  The court ordered Dominguez to file an expedited letter brief outlining her position, and received same on September 24, 2015.  (Doc. 22).  The court thereafter took the parties' arguments under advisement.

## II.   Discussion

The Hague Convention requires the petitioner to prove, by a preponderance of the evidence, that a child under the age of sixteen has been wrongfully removed or retained from his or her place of habitual residence in violation of the custody

rights of the petitioning parent.  See Hague Convention, arts. 3, 4.[11]  Such petitions

generally task the court to consider four issues: "(1) when the removal or retention

took place; (2) the child's habitual residence immediately prior to such removal or

retention; (3) whether the removal or retention breached the petitioner's custody

rights under the law of the child's habitual residence; and (4) whether the petitioner

was exercising his or her custody rights at the time of the removal or retention."

Tsui, 499 F.3d at 270-71; see also Baxter, 423 F.3d at 368.  If a petitioner establishes

his *prima facie* case by demonstrating that each of these inquiries are answered in

satisfaction of the Convention's requirements, the burden shifts to the respondent

to establish an affirmative defense against the requested return of the child.  Tsui,

499 F.3d at 271 (quoting Karkkainen v. Kovalchuk, 445 F.3d 280, 287 (3d Cir. 2006)).

There are several affirmative defenses available to Hague Convention

respondents.  The first four must be proven by a preponderance of the evidence;

they are: (1) the left-behind parent consented to or subsequently acquiesced in the

removal or retention of the child; (2) the petitioner delayed more than one year in

---

[11] Article 3 of the Convention contemplates both wrongful removal and
wrongful retention.  See Hague Convention, art. 3 (proscribing wrongful "removal
*or* retention" (emphasis added)).  Didon does not contend that the August 27, 2014
removal was wrongful; rather, he asserts that Dominguez wrongfully retained the
minor children in the United States when she failed to return to Saint Martin on
September 7, 2014.  Hence, the court analyzes this Hague Convention claim as one
for wrongful retention.  See Hague Convention, art. 3; see also Baxter v. Baxter, 423
F.3d 363, 370 (3d Cir. 2005) ("The words 'removal or retention' refer to whichever
may be relevant to the case at hand, and create a multiple, not alternative,
obligation.").  Material to this standard, we note that the Third Circuit Court of
Appeals has rejected the proposition that "if a parent consents to removal of a child
for a period, under certain conditions or circumstances, that retention of the child
beyond those conditions is necessarily permissible."  Baxter, 423 F.3d at 370 (citing
Doudle v. Gause, 282 F. Supp. 2d 922, 929 (N.D. Ind. 2003)).

commencing the proceedings and the child is settled in his or her new environment; (3) the left-behind parent was not exercising his or her custodial rights at the time of the child's removal or retention; or (4) the court finds that the child objects to the requested return "and has attained an age and degree of maturity at which it is appropriate to take account of its views."  Hague Convention, arts. 12, 13(a); <u>see also</u> 22 U.S.C. § 9003(e)(2).  The remaining two defenses must be proven by clear and convincing evidence; they are: (1) the child's return would violate policies of the requested state concerning human rights and fundamental freedoms; or (2) the child's return would result in a grave risk of physical or psychological harm to the child, or place the child in an intolerable situation.  Hague Convention, arts. 13, 20; <u>see also</u> 22 U.S.C. § 9003(e)(1).  Each defense is to be narrowly construed.  <u>Tsui</u>, 499 F.3d at 271 (quoting <u>Karkkainen</u>, 45 F.3d at 287).  Even when a court determines that one of the affirmative defenses applies, it is within the court's discretion to order the child's return to his or her habitual residence.  <u>See</u> <u>id.</u>

## A.    Didon's *Prima Facie* Case

As a threshold matter, the court notes that one material point is undisputed; that is, counsel agree that the date of the allegedly wrongful retention is September 7, 2014, the date on which Dominguez and the children were to return from their trip to the United States.  (<u>See</u> 9/22/15 Hr'g Tr. 93:1-93:20); <u>see also</u> <u>Tsui</u>, 499 F.3d at 271 n.12 ("[T]he date of wrongful retention begins when the child remains with the respondent against the petitioner's clearly communicated desire to have the child returned." (citing <u>Karkkainen</u>, 445 F.3d at 290)).  Ample record evidence supports the parties' agreement and establishes that Dominguez and the minor children

were expected to return to Saint Martin on September 7, 2014, but did not in fact return. (See 9/2/15 Hr'g Tr. 14:3-5 (Didon); 9/22/15 Hr'g Tr. 64:9-10, 65:10-13 (Dominguez)). The court is thus satisfied that the date of the allegedly wrongful retention in this case is September 7, 2014.

The parties vigorously dispute the proper resolution of the remaining inquiries. Didon argues that both J.D. and A.D. were habitually resident in Saint Martin prior to the allegedly wrongful retention, and that he had custodial rights as to both children as contemplated by the Hague Convention. (See Doc. 1 ¶¶ 24-28, 31). Dominguez counters that the family resided exclusively on Sint Maarten, the Dutch side of the island, and that neither child was habitually resident in Saint Martin. (Doc. 22 at 1-5). Dominguez further contends that Didon does not have custodial rights to minor child J.D., and that an affirmative defense against return applies. (Id. at 5-10) The court addresses the parties' arguments *seriatim*.

### 1. *Habitual Residence*

The Third Circuit Court of Appeals has held that, for Hague Convention purposes, "a child's habitual residence is the place where he or she has been physically present for an amount of time sufficient for acclimatization and which has a 'degree of settled purpose' from the child's perspective." Baxter, 423 F.3d at 368 (quoting Delvoye v. Lee, 329 F.3d 330, 323-33 (3d Cir. 2003); Feder v. Evans-Feder, 63 F.3d 217, 224 (3d Cir. 1995)). The Third Circuit has observed that "a determination whether any particular place satisfies this standard must focus on the child and consists of an analysis of the child's circumstances in that place and the parents' present, shared intentions regarding their child's presence there." Id.

The inquiry is "fact intensive and 'necessarily varies with the circumstances of each case.'" Tsui, 499 F.3d at 271-72 (quoting *In re* Application of Ariel Adan, 437 F.3d 381, 392 (3d Cir. 2006)).  Courts generally consider such factors as the length of time the child resided in the location at issue, whether the child was enrolled in school, where the child maintained citizenship, the language the child speaks, and where the child developed relationships and connections.  See, e.g., Lutman v. Lutman, No. 1:10-CV-1504, 2010 WL 3398985, at *4 (M.D. Pa. Aug. 26, 2010) (concluding that Israel was the child's habitual residence when he lived there for more than three years, was schooled there, had family there, and "undoubtedly felt settled there"); Karpenko v. Leendertz, No. 09-3207, 2010 WL 831269, at *6 (E.D. Pa. Mar. 4, 2010) (concluding that the Netherlands was a child's habitual residence prior to removal when the child resided in the Netherlands for six years, attended school and had friends there, spoke Dutch, and "was fully involved in all aspects of daily and cultural life in the Netherlands"), aff'd, 619 F.3d 259 (3d Cir. 2010).

The dispute *sub judice* focuses on a distinct and novel inquiry, derived from the unique, dual sovereign composition of the island of Saint Martin.  The island, only thirty-four (34) square miles in size, is divided by an international border: the northern part—known as Saint Martin—is a French territory, and the southern part—known as Sint Maarten—is a Dutch territory.[12]  The parties' testimony reveals that the border is so permeable as to be evanescent, and is regularly and readily traversed by residents and travelers alike.  In other words, for most purposes of its residents' daily life, the island is essentially undivided.  Dominguez and Didon both

---

[12] See *supra* at n. 5.

testified that they regularly travel between the French and Dutch sides of the island without restriction. Didon's testimony in particular highlights the incredibly small size of the island: he explained that when he travels from Sint Maarten to work in Saint Martin, the commute takes only five minutes. (See 9/22/15 Hr'g Tr. 25:19-24). Didon explained that there is "no border at all" between the two sides of the island, and that anyone is "free to travel from one side to the other." (Id.) As a practical point, the neighboring island territories of Saint Martin and Sint Maarten are inseparable under the Hague Convention for purposes of determining a child's habitual residence.

The court's conclusion that the island cannot be separated for purposes of establishing a habitual residence is undergirded by a number of factual findings pertinent to the more typical habitual residence inquiry. For example, although the family always resided in a rented apartment on the Dutch side of the island, (see 9/22/15 Hr'g Tr. 7:1-8:24 (Didon); 37:9-39:13 (Dominguez)), the children's school and doctors were both located on the French side. (See 9/22/15 Hr'g Tr. 26:4-5 (Didon), 69:2-19 (Dominguez)). Further, the family's administrative affairs, such as the children's insurance, were managed on the French side of the island. (See 9/22/15 Hr'g Tr. 69:2-19). Although their residence is in the Dutch territory, the children are French citizens and have French rather than Dutch passports. (See Didon Exs. 7-8). Didon also owned a two-unit apartment building on the French side of the island, and the family used that residence both as a rental unit for tourists and for

personal use.[13]  (9/22/15 Hr'g Tr. 26:6-12 (Didon), 43:23-45:16 (Dominguez)).  Hence, the record facts, in addition to the nature of the island itself, support a finding that J.D. and A.D. were habitual residents of *both* Sint Maarten and Saint Martin.

The court is aware of a line of decisions from other Circuit Courts of Appeals and district courts suggesting that children cannot have dual habitual residences under the Hague Convention, and that such a determination may hinder rather than effectuate the Convention's purposes.  See, e.g., Mozes v. Mozes, 239 F.3d 1067, 1075 n.17 (9th Cir. 2001) (noting "the view held by many courts that a person can only have one habitual residence at a time under the Convention"); Friedrich v. Friedrich, 983 F.2d 1396, 1401 (6th Cir. 1993) ("A person can have only one habitual residence."); see also Blanc v. Morgan, 721 F. Supp. 2d 749, 760 (W.D. Tenn. 2010) ("Disallowing more than one habitual residence also furthers the aims of the Hague Convention by facilitating recognition of one, and only one, country as the proper forum for deciding questions of custodial and parental rights.").  These decisions are notably distinct: the courts were deciding whether the child had abandoned a prior habitual residence in favor of a new one; the courts were not presented with

---

[13] Dominguez disputes any classification of the French apartment as a "residence," explaining that the family did not reside there permanently and only stayed there together five or six times per year.  (See 9/22/15 Hr'g Tr. 44:1-45:16).  Dominguez testified that the two-unit apartment building was primarily a rental property for tourists.  (See id.)  Nonetheless, Dominguez concedes that the family stayed overnight at the French side apartments on multiple occasions, and that she regularly cleaned the apartments after tourists completed their stay.  (See id.)  Further, Dominguez's oldest daughter, A.A., testified that the family hosted a birthday party for A.D. at the French residence.  (See id. 83:4-84:11).  The court agrees with Dominguez that the record does not establish that the French side apartment was the parties' *primary* residence on the island; nonetheless, its existence and periodic use by the family is a relevant factor in the habitual residence analysis.

the question at issue here: whether multiple prior residences may qualify as a habitual residence for purposes of the Hague Convention. <u>Cf.</u> <u>Mozes</u>, 239 F.3d at 1075 n.17; <u>Friedrich</u>, 983 F.2d at 1401; <u>Blanc</u>, 721 F. Supp. 2d at 760. At least one Circuit Court of Appeals has recognized an important exception to this general rule disfavoring dual habitual residency: "the rare situation where someone consistently splits time more or less between two locations, so as to retain alternating habitual residences in each." <u>Mozes</u>, 239 F.3d at 1075 n.17 (citing <u>Johnson v. Johnson</u>, 493 S.E.2d 668, 669 (Ca. Ct. App. 1997)).

In the court's view, the unique structure of this tiny island, coupled with the family's regular affairs on *both* sides thereof, present the exact type of "rare situation" contemplated by the <u>Mozes</u> court's *obiter dictum*. Dominguez's suggestion that a child could be habitually resident on one side of this divided island but not on the other would have the court fashion a formal border that the countries themselves do not recognize. Dominguez's submissions present the court with no logical reason to draw a line in the sand where the countries themselves do not. The evidence of record, including Dominguez's own testimony, establishes that the children's day-to-day activities transcended the divided island's border in a manner that renders the two nations indivisible for purposes of a habitual residence analysis. Under the circumstances, the court cannot but conclude that the children were habitually resident in *both* French Saint Martin and Dutch Sint Maarten.[14]

---

[14] The court emphasizes that this holding is to be strictly limited to the specific facts *sub judice*. The concept of dual habitual residency should continue to be the rare exception rather than the rule in Hague Convention cases.

## 2.  *Custodial Rights*

The court must next consider whether Didon had custodial rights to minor children J.D. and A.D. as contemplated by the Hague Convention.  Custody rights under the Convention "include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence"  Hague Convention, art. 5.  This inquiry tasks the court to closely examine "the country of origin's custody laws to determine whether the party seeking return had custody rights in that country . . . *at the time the child was removed*."  <u>In re</u> Adan, 437 F.3d at 391 (internal citation omitted).  As a threshold matter, the parties do not dispute that Didon shared custodial rights to A.D. with Dominguez, as A.D. is Didon's biological son.  <u>See</u> Code Civil [C. civ.] [Civil Code] art. 372 (Fr.) ("The father and mother shall exercise in common parental authority").  Hence, the instant custodial rights inquiry focuses exclusively on Didon's custodial relationship with J.D.[15] Didon seeks return of the children to French Saint Martin, and asserts that their removal was in violation of his custody rights under French law; hence, the court must determine the extent of Didon's custodial rights to J.D. under French law.

The pertinent provision of the French Civil Code undergirding the parties' dispute is Article 372, which provides:

> The father and mother shall exercise in common parental authority.

---

[15] The court again underscores that any determination herein under the Hague Convention is *not* a determinative custody ruling.  Rather, the court is only determining who had custody rights in the country of the J.D.'s habitual residence at the time of the wrongful retention, for purposes of determining whether J.D. was wrongfully retained.  <u>See</u> Hague Convention, art. 19.

> Where, however, parentage is established with regard to one of them more than one year after the birth of a child whose parentage is already established with regard to the other, the latter alone remains vested with the exercise of parental authority. It shall be likewise where parentage is judicially declared with regard to the second parent of the child.
>
> Parental authority may however be exercised in common in case of joint declaration of the father and mother before the chief clerk of the tribunal de grande instance or upon judgment.

See CODE CIVIL [C. CIV.] [CIVIL CODE] art. 372 (Fr.). Didon acknowledges this provision, and further acknowledges that he did not "recognize" J.D. as his child until 2011, well beyond one year after her birth. See id. Instead, Didon contends that by adding his name to J.D.'s birth certificate in 2011, Didon formally "adopted" J.D. for purposes of the Convention. (See 9/22/15 Hr'g Tr. 13:11-15:25). Didon also contends that the March 23, 2015 custody determination, rendered *ex parte* when Dominguez did not appear to defend the custody action, relates back to his June 2014 custody complaint, retroactively vesting him with full custodial rights at the time of the allegedly wrongful retention. (See 9/22 Hr'g Tr. 27:2-29:16). Neither argument succeeds.

Article 372 of the French Civil Code is clear that when parentage is established more than one year after the child's birth, only the parent as to whom parentage was previously established retains parental authority. See CODE CIVIL [C. CIV.] [CIVIL CODE] art. 372 (Fr.). In such circumstances, exclusive parental authority remains vested in the established parent—here Dominguez—unless the mother and father make a joint declaration before the chief clerk of the tribunal de

16

grande instance, or upon judgment.  See id.  Although Didon contends that the

modification of J.D.'s birth certificate in 2011 constituted a formal and legal

adoption for purposes of Section 372, the Code's plain language precludes any such

finding.  See id.  The Code is explicit in its prerequisites, and Didon has established

neither.  Indeed, the French Central Authority agreed, stating in a January 9, 2015

response to Didon's petition thereto:

> Please find attached a new application on behalf of Mr
> Maurice DIDON for the return of his child [A.D.] to
> France (Saint-Martin/French West Indies).
>
> . . .
>
> The parents are not married to each other and both have
> parental authority over the child in accordance with
> article 372 of the French Civil Code you will find attached.
> *Conversely, the French central authority doesn't transfer*
> *the documents about [J.D.] because according to French*
> *law, Mr DIDON does not exercise parental authority*
> *regarding that child because parentage was established*
> *more than one year after her birth.  Therefore, the French*
> *central authority considers Mr DIDON was not attributed*
> *rights of custody over that child and cannot ask for her*
> *return to France pursuant to the 1980 Hague Convention.*

(Doc. 2 Ex. I (emphasis added)).  Consequently, Didon cannot establish custodial

rights under Article 372.

Didon contends alternatively that the March 23, 2015 custody judgment vests

full parental authority as to both J.D. and A.D. in him, exclusively.  The court agrees

that the judgment purports to accomplish just that.  (See Didon Ex. 13).  However,

the judgment was not issued until more than six months *after* the alleged wrongful

retention date of September 7, 2015.  (See id.)  Custodial rights under the Hague

Convention are determined at the time of the allegedly wrongful removal or

wrongful retention.  See Tsui, 499 F.3d at 275 (determining rights at the time of retention); In re Adan, 437 F.3d at 391 (same, at the time of removal).  It logically follows that such rights cannot be retroactively established, see id., and Didon directs the court to no legal authority to contradict this logical conclusion.

During the preliminary hearing on September 2, the court alerted Didon's counsel to its concerns regarding his custodial rights to J.D., directing counsel to Article 372 and the January 9, 2015 letter from the French Central Authority.  In response, at the second hearing, Didon's counsel presented correspondence dated September 18, 2015, from the French Central Authority, explaining that the French authority issued a revised application on Didon's behalf on June 30, 2015 as to both A.D. and J.D., in light of the May 23, 2015 custodial judgment, "because this decision gives him rights of custody as requested by the Hague Convention."  (See Didon Ex. 18).  This evidence is merely consistent with the court's earlier observation that the judgment purports to vest sole parental authority in Didon; it does not contradict the above discussed case law which mandates that custody shall be determined as of the time of the wrongful retention, nor does it identify any legal authority for the proposition that custody rights under the Convention may be created retroactively. Hence, the court rejects Didon's reliance on the September 18, 2015 letter as proof of his custodial rights to J.D.

The court concludes that Didon did not have custodial rights to J.D. at the time of the wrongful retention and will therefore deny Didon's petition with respect to minor child J.D.  The court's analysis continues with respect to minor child A.D. only.

### 3.   *Exercise of Custodial Rights*

Hague Convention case law contemplates potential waiver of custodial rights and requires a petitioner to show that he or she "was exercising his custody rights at the time of the removal or retention." Tsui, 499 F.3d at 270-71; see also Baxter, 423 F.3d at 368. The Third Circuit has held that the standard for demonstrating non-exercise of custodial rights under the Hague Convention "is stringent." Baxter, 423 F.3d at 370 (citing Friedrich, 78 F.3d at 1065-66). Courts should "liberally find exercise" whenever a parent with custodial rights "keeps, or seeks to keep, any sort of regular contact with his or her child." Friedrich, 78 F.3d at 1065-66 ("If a person has valid custody rights to a child under the law of the child's habitual residence, that person cannot fail to 'exercise' those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment."); see also Sealed Appellant v. Sealed Appellee, 394 F.3d 338, 344-45 (5th Cir. 2004) ("To show failure to exercise custody rights, the removing parent must show the other parent has abandoned the child.").

Given the court's resolution of the custodial rights issue, the analysis with respect to this final factor pertains exclusively to minor child A.D. The court finds that Didon unequivocally exercised his custodial rights as to that child. Prior to Dominguez's departure with the children, the family unit had been living together on the Dutch side of Saint Martin since A.D.'s birth in 2010. (See 9/2/15 Hr'g Tr. 10:9-18). Didon and Dominguez shared caregiver responsibilities for A.D., (see 9/2/15 Hr'g Tr. 10:19-21), and Dominguez testified that Didon took an interest in his education, (see 9/22/15 Hr'g Tr. 69:20-22). The record also shows that Didon took

the family on a month-long vacation to Paris prior to Dominguez's departure to the United States. (See 9/2/15 Hr'g Tr. 11:2-12:8 (Didon); see also 9/22/15 Hr'g Tr. 64:22-65:5 (Dominguez)). The court concludes that Didon consistently exercised his custodial rights with respect to minor child A.D. from the time A.D. was born until Dominguez departed with the children, and that he undertook exhaustive efforts to continue to do so after said departure. (See 9/2/15 Hr'g Tr. 12:10-16:21). Hence, Didon has satisfied each requisite element of his *prima facie* request for return of minor child A.D. under Article 3 of the Hague Convention.

## B. Dominguez's Affirmative Defense

At this juncture, with Didon having proven his *prima facie* case for return of minor child A.D., the burden shifts to Dominguez to establish an affirmative defense against return of the child. See Tsui, 499 F.3d at 271 (quoting Karkkainen, 445 F.3d at 287). Dominguez asserts only one affirmative defense against the return of A.D. to Didon's custody: that there is a "grave risk" that returning A.D. to Saint Martin "would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention, art. 13(b). The evidence of record falls short of satisfying Dominguez's burden of proof for this defense.

The grave risk of harm defense requires proof by clear and convincing evidence. 22 U.S.C. § 9003(e)(2)(A); Baxter, 423 F.3d at 373 (explaining that "the respondent must cite specific evidence of potential harm to the child upon his return"). The exception applies most commonly in two specific circumstances: "when return of the child puts the child in imminent danger . . . e.g., returning the child to a zone of war, famine, or disease . . . [and in] cases of serious abuse or

neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection." Baxter, 423 F.3d at 373 (quoting Friedrich, 78 F.3d at 1069). Courts have rejected application of the defense in cases involving mere "inconvenience or hardship," or the elimination of certain educational or economic opportunities; instead, courts routinely hold that the exception applies only in those cases where "the child faces a real risk of being hurt, physically or psychologically, as a result of repatriation." Id. (quoting Blondin v. Dubois, 238 F.3d 153, 162 (2d Cir. 2001)); see also 51 Fed. Reg. 10,510 (Mar. 26, 1986) (explaining that when a parent removes a child to prevent further sexual abuse and victimization of the child, the grave risk defense may apply).

Dominguez has not presented any credible evidence of either physical or sexual abuse of minor child A.D. by his father. Dominguez expressly denied that Didon physically abused A.D. (See 9/22/15 Hr'g Tr. 55:4-9). In response to Didon's petition, Dominguez raises a lone assertion of sexual abuse, contending that she observed an "unusual" incident while Didon was bathing A.D., involving what she perceived to be inappropriate washing of A.D.'s genitals. (See id. 48:21-49:11). There is no indication that Dominguez filed a police report regarding this alleged incident. There is no physical, photographic, or medical evidence of abuse. And Didon vehemently denies Dominguez's isolated allegation. (See 9/2/15 Hr'g Tr. 25:7-20; 91:19-2). Having observed the respective demeanors of both parties, and in the absence of corroborating evidence of abuse, the court credits Didon's testimony

over Dominguez's account on this point.[16]  A single, unsubstantiated allegation of abuse falls well short of satisfying the clear and convincing evidence standard applicable to this particular defense.  See 22 U.S.C. § 9003(e)(2)(A); Baxter, 423 F.3d at 373 (tasking respondents to cite "specific evidence" establishing the likelihood of "real risk" to the child upon repatriation).  The court concludes that the record is devoid of credible evidence of sexual abuse.

Dominguez also testified that there was friction in the family unit, largely between Didon and Dominguez, and on occasion between Didon and Dominguez's oldest daughter, A.A.  (See, e.g., 9/22/15 Hr'g Tr. 54:9-23, 55:21-58:7).  Dominguez also asserts that Didon's bathroom use rule was "unusual."  (See Doc. 22 at 9-10).  It is unclear whether Dominguez intends this argument to serve as separate support for the grave risk of harm defense.  Nonetheless, familial friction and discordance are not uncommon within family units, and whether considered separately from or collectively with the above described testimony, the court concludes that evidence of occasional disagreements between Dominguez and Didon, or between A.A. and Didon, fails to establish any likelihood that *minor child A.D.* will experience a risk of

---

[16] The court notes with interest that when asked by counsel to explain why she left the country with the children, Dominguez enumerated specific instances of alleged verbal and physical abuse against herself, against J.D., and against A.A., but did not identify the alleged incident involving A.D. as a reason for removing the children.  (See 9/22/15 Hr'g Tr. 54:8-55:9).

physical or psychological harm upon his return to the island.  See 22 U.S.C. §

9003(e)(2)(A); Baxter, 423 F.3d at 372.

The court concludes that Dominguez has failed to establish that A.D. will face

"real risk of being hurt, physically or psychologically, as a result of repatriation."

See Baxter, 423 F.3d at 372 (quoting Blondin, 238 F.3d at 162).  Indeed, the record

establishes that A.D. was happy to be reunited with his father over the lunch break

during the September 22, 2015 proceeding.  (9/22/15 Hr'g Tr. 66:9-14).  The court

concludes that A.D. will not face "grave risk of harm" upon his return to Saint

Martin.  See Hague Convention, art. 13(b).

**III.    Conclusion**

For all of the foregoing reasons, the court will grant Didon's petition with

respect to minor child A.D. but deny the petition with respect to minor child J.D.

An appropriate order shall issue.


/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania